FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 0 5 2025

TAMMY H. DOWNS, CLERK
By:_____
                    DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

SOUTHERN LEGACY OF LIFE;
JULIE BARBER                                                                    PLAINTIFFS

v.                                           Case No. 4:25-cv-00773

COLE JESTER, *in his official capacity as Secretary of State*;
TIM GRIFFIN, *in his official capacity as Attorney General of
Arkansas*; TODD MURRAY, SONIA HAGOOD,
DEVON HOLDER, BRANDON CARTER, JEFF PHILLIPS,
WILLIAM JONES, TERESA HOWELL, BEN HALE,
CONNIE MITCHELL, DAN TURNER, JANA BRADFORD,
FRANK SPAIN, TIM BIAIR, KYLE HUNTER,
DANIEL SHUE, JEFF ROGERS, DAVID ETHREDGE,
TOM TATUM, II, DREW SMITH, REBECCA REED MCCOY,
MICHELLE C. LAWRENCE, DEBRA BUSCHMAN,
TONY ROGERS, BRYAN SEXTON, CAROL CREWS,
KEVIN HOLMES, CHRIS WALTON, and CHUCK GRAHAM,
*each in his or her official capacity as a prosecuting attorney
for the State of Arkansas*                                                      DEFENDANTS

## AMENDED COMPLAINT

Plaintiffs Southern Legacy of Life ("SLL") and Juile Barber (collectively, "Plaintiffs"), by

and through their undersigned counsel, bring this action for declaratory and injunctive relief

against Cole Jester, in his official capacity as Secretary of State, and Tim Griffin, in his official

capacity as the Attorney General of Arkansas, Todd Murray, Sonia Hagood, Devon Holder,

Brandon Carter, Jeff Phillips, William Jones, Teresa Howell, Ben Hale, Connie Mitchell, Dan

Turner, Jana Bradford, Frank Spain, Tim Biair, Kyle Hunter, Daniel Shue, Jeff Rogers, David

Ethredge, Tom Tatum, II, Drew Smith, Rebecca Reed McCoy, Michelle C. Lawrence, Debra

Buschman, Tony Rogers, Bryan Sexton, Carol Crews, Kevin Holmes, Chris Walton, and Chuck

Graham, each in his or her official capacity as a prosecuting attorney for the State of Arkansas,

and together representing all 75 counties in Arkansas (collectively, the "Defendants") to have key

1

#125125637v2

portions of Arkansas Act 861 ("Act 861") declared unconstitutional under the United States Constitution and the Constitution of the State of Arkansas, and in support thereof aver as follows:

## INTRODUCTION

1. The primary issue raised in this case is that Arkansas amended its Anatomical Gift Act to allow an indefinite number of people to revoke an organ donor's gift post-mortem for an unlimited amount of time, regardless of the anatomical gift a donor documented during life.

2. This amendment, Act 861, causes utter chaos to the existing system of national organ donation, the result of which will be a certain loss of life.

3. While state law generally governs testamentary gifts, this unprecedented change in Arkansas law – which differs substantially from prior Arkansas law and the law in every other state – completely undermines the federal system to the point where acceptance of organs from an Arkansas donor is rendered impracticable, if not impossible.

4. Congress's clear intent in legislating organ donation was to create a congruent system that promoted, not inhibited, the national distribution of lifesaving gifts that are crucially needed across the country.

5. Congress established a national organ transplant infrastructure in 1984 by enacting the National Organ Transplant Act of 1984, Pub. L. 98-507, 98 Stat. 2339 (Oct. 19, 1984) (codified as amended at 42 U.S.C. §§ 273 et seq.) ("NOTA") to create an efficient, robust, and fair organ donation and transplant system, which deemed all donated organs for transplant national resources to be distributed to a national waitlist of patients in need of life saving organ transplants.

6. Under this federalized system of organ recovery, Organ Procurement Organizations ("OPOs") work closely with acute care hospitals, transplant centers, and donor families to respond to identified potential donors and assess donor potential, obtain and/or document authorization of

2

the gift, and then, within the federal system, recover, preserve, transport, and otherwise facilitate the donation of organs for life-saving transplant.

7.    One OPO is federally designated by the Centers of Medicare & Medicaid Services ("CMS") to serve each discrete geographic area known as a Donation Service Area ("DSA"), and this exclusive authority to facilitate organ donation as an OPO is granted by the federal government alone.

8.    Under the existing federal organ donation system, individuals needing organ transplants are evaluated by a transplant center and then placed on a national wait list. These individuals may then be matched with a donated organ from anywhere else in the United States when one is made available, based on a variety of factors including length of time on the waiting list, tissue match, likelihood the recipient's body will not reject the organ, distance, and degree of medical urgency (a "match run"). There are over 250 transplant centers in the United States, and a number of them may be matched for any given organ.

9.    Before an organ can be offered for a match run, an OPO must first determine whether donation of the organ has been authorized. The question of whether there is authorization to donate a decedent's organs, tissue, or body (the donation being an "anatomical gift," and the authorization for such being a "document of gift") is a matter of state law.

10.    Every state in the United States has adopted some form of the Uniform Anatomical Gift Act ("UAGA"), which determines who may make an anatomical gift, the manner in which it is made, and the form of a document of gift. Arkansas adopted its Revised Uniform Anatomical Gift Act ("RUAGA") in 2007.

11.    Federal law requires that OPOs receive a referral when there is an imminently deceased or deceased patient in a hospital within the OPO's DSA. The OPO then must determine

3

if the patient has made an anatomical gift, and reviews basic demographic and clinical information about the donor to see if the donor has clinical donation potential. Federal law requires that this referral be timely made by the hospital, so that OPOs may ascertain donation status quickly and potentially collaborate on communication with the family. Timely is defined by agreements between the OPO and each individual hospital. In Arkansas, the attending physician is notified prior the initial interaction with the family.

12. If an OPO determines the potential donor is clinically suitable and has a valid document of gift, the OPO will then begin the match run.

13. If a potential donor did not make an anatomical gift while alive, an Arkansas OPO follows RUAGA to determine if another authorized person or classes of people listed in RUAGA can make an anatomical gift. If an anatomical gift is made, the match run begins.

14. The transplant center with the first matching potential recipient is then notified of the available organ and must determine within an hour whether to accept or refuse the organ on behalf of a waitlisted patient based on medical criteria, condition of the offered organ, condition of the potential recipient, staff and patient availability, and transportation. An organ may be offered to and rejected by multiple transplant centers in rapid succession before it is accepted.

15. A patient recipient may be prepared for surgery immediately after they've been notified of a transplant center's acceptance of an organ on their behalf.

16. OPOs must simultaneously undertake a wide variety of other activities and logistics starting with the initial referral, including preserving the viability of the organs within a deceased donor, conducting rapid clinical testing, arranging nationwide transport for surgeons and the organs, and supporting grieving and hopeful families.

17. Organ donation is an extremely time sensitive process because of the limited

4

window of clinical viability – of the donor, the organs, and the recipient – necessary to successfully recover and transplant donated organs. The state law authorization and complex federal matching systems of donation must be rapidly and simultaneously executed so the delicate medical processes proceeds with enough time to achieve a successful transplant.

18. In 2024, the time between authorization and surgical operation to remove the donated organs for Arkansas's primary DSA was 48.6 hours.

19. Every minute saved in the process increases the likelihood of a successful recovery and transplant. Conversely, any delays in the process increase the likelihood of organ dysfunction or failure. The unfortunate reality is that any patient on the waiting list may die before another viable organ becomes available, and even the preparation for a transplant which is aborted may pose risks to the recipient.

20. In every state and under the existing RUAGA, an anatomical gift made by the donor cannot be amended or revoked by any other person other than the donor themselves. When an anatomical gift is made by another person after the donor's death, the gift may not be revoked once an incision has been made in the donor or commencement of surgery preparations on the recipient has begun.

21. This is a fundamental understanding of each of the 56 OPOs who depend on the validity of the document of gift of each state in order to protect the recipient and to quickly and decisively determine the donation status of donors, regardless of the donor's state of origin.

22. Act 861, which is slated to go into effect on August 5, 2025, disrupts the entire federal organ procurement and transportation network by, among other things, allowing distant relatives to revoke a donor's anatomical gifts after death and providing for an indefinite window within which the revocation can occur.

5

#125125637v2

23.     Specifically, Act 861 provides that a donor's prior anatomical gift may be modified, amended, or revoked by anyone within eight levels of kinship to the decedent beginning two hours after death and without end without regard to the decedent's written wishes regarding organ donation.  A true and accurate copy of Act 861 is attached hereto as **Exhibit A.**

24.     Act 861 dictates that gifted organs may be pulled back by revoking or amending a document of gift at any point in the organ donation process, without limit: after the organs have been matched, while the organs are being surgically removed, while they are being flown to their recipient, while they are being transplanted into the recipient, even thereafter.

25.     The finality of an organ match and offer to a transplant center is a predicate of the entire federal organ and transplant system.  Federal law and the national waiting list system do not even contemplate a situation where an organ offered for a match run may not be accepted by a transplant center because it may later be revoked.  Federal law, regulation, and the UAGA in every state is in accord that documents of gift are irrevocable, meaning organs are only offered when an anatomical gift has been confirmed.

26.     OPOs attempting to follow Act 861 cannot ascertain the finality of an anatomical gift within the time frame necessary to allow for the organ to be transplanted.  Completing a complete probate level search as required by Act 861 takes days to months, when organs must be transplanted within a span of hours.  The tremendous uncertainty caused by Act 861 makes it impossible or impracticable for medical professionals to recover life-saving organs from willing Arkansas donors.

27.     While some sections of Act 861 purport to "vest" a majority of a class of the decedent's kin with the right to modify, amend, or revoke an anatomical gift on the decedent's behalf, it is unclear whether the list of kin in Act 861 is hierarchical such that a vesting in the first

6

level negates the requirement to consult kin belonging to the next seven levels listed in Act 861.

28.    If the list is not hierarchical, Act 861 requires next of kin to seek approval of eight categories of extended family to honor a decedent's lifetime decision to donate before an anatomical gift can be finalized.

29.    Even if the list is hierarchical (which is anything but clear), Act 861 still injects burden and delay by requiring the approval of a majority of a single category of family members to honor a decedent's lifetime decision to donate before a gift can be finalized.

30.    To compound all of this, Act 861 provides that an anatomical gift may be modified, amended, or revoked, beginning "two (2) hours after the pronouncement of cardiac or asytolic death[,]" but provides for no deadline when the decision must become final.

31.    Act 861 makes family members acting for the decedent and the OPO charged with performing the steps required for the facilitation of organ procurement criminally responsible for noncompliance with Act 861, even though it cannot be determined with certainty when compliance has been achieved.  At any step in the process, including after an organ transplant has occurred, one of an indefinite number of the donor's relatives might later revoke the gift.

32.    Despite this cloud of uncertainty, Act 861 revokes the immunity to OPOs formerly included in RUAGA.

33.    Likewise, Act 861 revokes the immunity for the donor's kin acting in good faith formerly included in RUAGA.

34.    Furthermore, and to add yet another issue with the federal scheme, when an Arkansas citizen dies in another jurisdiction, Act 861 requires the OPOs in that jurisdiction to apply Arkansas law regarding whether the donor has made a valid anatomical gift, subjecting OPOs outside Arkansas to the same uncertainties (and liabilities) as the OPOs that primarily

7

#125125637v2

operate within Arkansas.

35.    Act 861 makes an irrevocable lifetime decision to become an organ donor contingent on the post-mortem approval of as many as eight categories of family members. The burden, complexity, and uncertainty of satisfying this requirement all but eliminates the likelihood that the decedent's decision to save lives of others by donating organs for transplant will be honored.

36.    Act 861 not only will cost the lives of those desperately needing organ transplants, it is also clearly preempted by federal law and in violation of the United States Constitution and the Constitution of the State of Arkansas.

## THE PARTIES

37.    Plaintiff SLL is a non-profit, federally designated OPO committed to saving and healing lives through facilitating organ and tissue donation from deceased donors.

38.    SLL is one of 56 non-profit OPOs across the United States, each of which are certified by CMS to operate within a designated DSA. Headquartered in Little Rock, SLL's donation service area encompasses 64 of Arkansas' 75 counties, including more than 70 hospitals and three transplant centers. In total, SLL serves a population of approximately 2.6 million people. SLL facilitates the donation of organs from donors who die within SLL's donation service area to transplant centers across the country, regardless of where the donor resides. In 2024, SLL coordinated the recovery, delivery, and donation of organs through transplant centers in 31 states, including Arkansas.

39.    Plaintiff Julie Barber is a natural person and citizen of Arkansas. Mrs. Barber is a liver transplant recipient, having received her liver transplant on June 26, 2023. Mrs. Barber is currently on the national organ donation waiting list for a kidney transplant. Mrs. Barber is also a

#125125637v2

registered organ donor, having registered on the Donate Life Arkansas Registry to be an organ and tissue donor.

40.    Defendant Cole Jester is a natural person and citizen of Arkansas being sued for declaratory and injunctive relief in his official capacity as the Secretary of State for the State of Arkansas.  Mr. Jester is the chief executive officer of the Office of the Secretary of State and exercises superintending authority over the activities of his agents, designees, employees, and representatives, including their conduct relating to Act 861.  The Office of the Secretary of State is the office charged with overseeing charitable organizations operating in Arkansas, including SLL.  Act 861 vests the Office of the Secretary of State with the authority to revoke SLL's charter for failure to comply with certain reporting requirements.

41.    Defendant Tim Griffin is a natural person and citizen of Arkansas being sued for declaratory and injunctive relief in his official capacity as the Attorney General for the State of Arkansas.   Mr. Griffin exercises superintending authority over the activities of his agents, designees, employees, and representatives, including their conduct relating to Act 861. Mr. Griffin and his office are charged with defending the constitutionality of Act 861 in this Court as well as defending any future actions to prevent a state officer, board, or commission from enforcing the provisions of Act 861. Ark. Code Ann. § 25-16-703(a) and, indeed, have previously issued written opinions on the application of RUAGA, which Act 861 purports to amend. The authority of Mr. Griffin and his office may include enforcement of Act 861 by the prosecution of civil claims and criminal charges against OPOs and family members of organ donors arising out of the failure of Act 861 to include them in the grant of immunity for acting in accordance with Act 861 or attempting in good faith to do so.

9

#125125637v2

42.     Todd Murray is the Prosecuting Attorney for the First Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

43.     Sonia Hagood is the Prosecuting Attorney for the Second Judicial District. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws.

44.     Devon Holder is the Prosecuting Attorney for the Third Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

45.     Brandon Carter is the Prosecuting Attorney for the Fourth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

46.     Jeff Phillips is the Prosecuting Attorney for the Fifth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

47.     William Jones is the Prosecuting Attorney for the Sixth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

48.     Teresa Howell is the Prosecuting Attorney for the Seventh Judicial District. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws.

#125125637v2

49.     Ben Hale is the Prosecuting Attorney for the Eighth Judicial District - North. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

50.     Connie Mitchell is the Prosecuting Attorney for the Eighth Judicial District - South. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws.

51.     Dan Turner is the Prosecuting Attorney for the Ninth Judicial District - East. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

52.     Jana Bradford is the Prosecuting Attorney for the Ninth Judicial District - West. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws.

53.     Frank Spain is the Prosecuting Attorney for the Tenth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

54.     Tim Blair is the Prosecuting Attorney for the Eleventh Judicial District - East. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

55.     Kyle Hunter is the Prosecuting Attorney for the Eleventh Judicial District - West. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

#125125637v2

56.     Daniel Shue is the Prosecuting Attorney for the Twelfth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

57.     Jeff Rogers is the Prosecuting Attorney for the Thirteenth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

58.     David Ethredge is the Prosecuting Attorney for the Fourteenth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

59.     Tom Tatum, II is the Prosecuting Attorney for the Fifteenth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

60.     Drew Smith is the Prosecuting Attorney for the Sixteenth Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

61.     Rebecca Reed McCoy is the Prosecuting Attorney for the Seventeenth Judicial District. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws.

62.     Michelle C. Lawrence is the Prosecuting Attorney for the Eighteenth Judicial District - East. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

12

#125125637v2

63.    Debra Buschman is the Prosecuting Attorney for the Eighteenth Judicial District - West. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws.

64.    Tony Rogers is the Prosecuting Attorney for the Nineteenth Judicial District - East. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

65.    Bryan Sexton is the Prosecuting Attorney for the Nineteenth Judicial District - East. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

66.    Carol Crews is the Prosecuting Attorney for the Twentieth Judicial District. She is sued in her official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which she acts under color of law to enforce Arkansas's criminal laws.

67.    Kevin Holmes is the Prosecuting Attorney for the Twenty-First Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

68.    Chris Walton is the Prosecuting Attorney for the Twenty-Second Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

69.    Chuck Graham is the Prosecuting Attorney for the Twenty-Third Judicial District. He is sued in his official capacity only, as a Prosecuting Attorney for the State of Arkansas, a position in which he acts under color of law to enforce Arkansas's criminal laws.

## JURISDICTION AND VENUE

70.    This action arises under the United States Constitution and NOTA, the federal

13

#125125637v2

statute establishing the framework for organ donation and transplantation. This Court has subject matter jurisdiction under 28 U.S.C. § 1331. The Court is authorized to grant legal and equitable relief under 42 U.S.C. § 1983, Ark. Code Ann. § 16-123-105(a), and *Ex parte Young*, 209 U.S. 123 (1908), injunctive relief under 28 U.S.C. § 1651 and Ark. Code Ann. § 16-123-105(a), and declaratory relief under 28 U.S.C. §§ 2201(a), 2022 and Ark. Code Ann. § 16-111-101.

71.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because many Defendants perform their official duties in the Eastern District of Arkansas and are therefore considered to reside in this District as a matter of law, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this district.

## FACTUAL ALLEGATIONS

### The National Organ Donation System in the United States

72.    In the United States, organ donation operates as a national network whereby donated organs are allocated to donees who are listed on a federal database of prospective donees.

73.    The National Organ Donation system works so fluidly to save lives across the country because Congress established a federal statutory and regulatory scheme that allows all jurisdictions to operate in ways that are functionally uniform and congruent.

74.    The Organ Procurement and Transplantation Network (the "OPTN") is a private, non-profit entity established at the direction of Congress to perform essential functions in implementing NOTA. The Department of Health and Human Services ("HHS"), through the Health Resources and Services Administration ("HRSA"), is responsible for managing and overseeing the OPTN and its contractors. 42 C.F.R. §§ 121.4, 121.10.

75.    Congress has charged the OPTN with "establish[ing] . . . a national system . . . to

14

match organs and individuals included on a [National Organ Donation] list." *Id.* at § 274.

76.    Under NOTA, the OPTN must maintain a national list of transplant candidates, implement a system for allocating donated organs, and ensure the equitable distribution of organs to needy recipients. *See id.* § 274(b).

77.    In 1999, the Department of Health and Human Services issued a "Final Rule," codified at 42 C.F.R. §§ 121.1–13, which governs, among other things, the procedural aspects surrounding the OPTN's issuance of policies, section 121.4, and the substantive criteria the OPTN should consider when determining policies, section 121.8.

78.    Pursuant to those regulations, the OPTN has a regulatory duty to "avoid wasting organs . . . and to promote the efficient management of organ placement[.]" 42 C.F.R. § 121.8(5).

79.    The regulations further vest the OPTN with responsibility of "developing . . . policies within the mission of the OPTN . . . including . . . [p]olicies for the equitable allocation of cadaveric organs[.]" 42 C.F.R. § 121.4 (a)(1).

80.    Pursuant to that authority, the OPTN has published a more than 350-page policies and procedures manual (the "OPTN Policies"), setting forth in detail all aspects of how the national organ donation network operates. A true and accurate copy of the operative OPTN Policies extant on the date of filing is attached hereto as **Exhibit B**.

81.    Congress established OPOs to administer this system as the sole organizations that can procure organs for donation. 42 U.S.C. § 273(b)(3).

82.    OPOs are tasked with "arrang[ing] for the acquisition and preservation of donated organs," leading efforts "to acquire all useable organs from potential donors," and coordinating or providing for "the transportation of donated organs to transplant centers." *Id.* The system and processes surrounding the encouragement, facilitation, and accomplishment of post-mortem organ

15

#125125637v2

donation is the exclusive domain of the OPOs.

83.    In Section 2.2 of the OPTN Policies, OPOs are tasked with providing evidence of donor authorization. Ex. B at 23.

84.    Notably, in section 2.14.E, which is titled "Deceased Donor Authorization Requirements," OPOs "may only recover organs that they have received authorization to recover." *Id.* at 35.

85.    But, in section 2.14.G, which is titled "Start Time for Organ Procurement," the OPTN Policies state that "[a]fter organs have been offered and accepted, recovery teams must agree on the time the procurement will begin."

86.    Therefore, the OPTN Policies require proof of donor authorization while also mandating that an offer and acceptance of the donation must occur for the procurement to commence.

87.    This indicates that, at a minimum, any state law regarding organ donation cannot leave open-ended when and how a gift is finalized. Otherwise, the recovery process cannot begin.

88.    While states may differ on the specific provisions of their own respective Anatomical Gift Acts, those difference cannot undermine or conflict with the national system established by Congress.

### OPOs and the Administration of the National Organ Donation System

89.    To operate as an OPO, entities must meet certain performance-related standards and be certified by CMS. 42 U.S.C. § 1320b-8(b).

90.    Each OPO is also required to be a member of OPTN. 42 C.F.R. § 121.3.

91.    As a condition of participation in Medicare and Medicaid, CMS requires that OPOs have written agreements in place with 95% of all participating Medicare and Medicaid hospitals

#125125637v2

within the OPO's DSA.  42 CFR § 486.322(a).

92.    Federal and Arkansas law requires hospitals to refer all imminently deceased and deceased patients to their designated OPO.  42 CFR § 482.45(a); Ark. Code Ann. § 20-17-1214.

93.    OPOs occupy a custodial role as the only entity that may accept a gift of a transplantable organ and in turn offer the organ to the next recipient on the national list of patients needing that organ.

94.    Upon referral, OPOs receive basic demographic and medical information to determine the patient's initial clinical potential for organ donation.

95.    OPOs then determine whether an anatomical gift has been made, either by the potential donor or, if the potential donor has not elected to become a donor, by a hierarchal list of individuals and classes of family members under RUGA.  Ark. Code Ann. § 20-17-1209(a).

96.    If the potential donor has already elected to be an organ donor, federal and state law require that the OPO communicate that fact with their family, discuss the process of organ recovery, elicit questions and address concerns, and obtain familial medical history to evaluate the suitability of organs for transplant.

97.    The existing law in every state prohibits anyone from revoking or amending a donor's anatomical gift.

98.    If the potential donor has not elected to become an organ donor and no longer has capacity, the hospital and/or the OPO will ask the highest ranking class member authorized to make an anatomical gift under RUAGA if they would like to donate the potential donor's organs upon the potential donor's death.  Ark. Code Ann. § 20-17-1209(a).

99.    The decision by a someone other than the potential donor to donate their organs is governed by state statute, but in RUAGA and in every state, there is a clear finality to the decision

17

whereby, if the decision to donate has been made, the OPO can begin the process of recovery. A lesser priority individual or class under RUGA cannot overrule the decision of a higher individual or class, and, once the process of recovery has begun by incision of the donor or commencement of surgery preparations on the recipient, the decision is final. Ark. Code Ann. § 20-17-1208

100.    After donor status has been confirmed, the OPO may commence offering the organ to the federal list by entering pertinent information into the OPTN-maintained national data bank of recipients.

101.    A transplant center then accepts the organ on behalf of the recipient, and the offering process for that organ ceases.

102.    The transplant center notifies and prepares the recipient patient after the organ is accepted.

103.    Depending on the organ type, acuity of the recipient, and the urgency of the need of the organ, the recipient patient may undergo preparatory surgery prior to the arrival of the organ to the transplant center.

104.    Many of these recipient patients are desperately ill, meaning even the preparatory surgery poses significant risk.

105.    Because of this complicated and delicate process and the public good to be accomplished by life-saving or life-enhancing organ transplant, OPOs have historically had absolute civil and criminal immunity for good faith compliance with relevant laws such as RUAGA.  Ark. Code Ann. § 20-17-1218(a) ("A person who acts in accordance with this subchapter or with the applicable anatomical gift law of another state, or attempts in good faith to do so, is not liable for the act in a civil action, criminal prosecution, or administrative proceeding.").  Act 861 revokes that immunity for OPOs and family members honoring a

18

#125125637v2

decedent's lifetime commitment to donate organs to save and enhance the lives of others.  Ark. Code Ann. § 20-17-1228(f) ("A hospital, clinic, physician, healthcare provider, funeral director, or funeral home acting in accordance with this section, or attempting in good faith to do so, is not liable for the act in a civil action, criminal prosecution, or administrative proceeding.").

106.    Any impediment to execution of the federal organ donation system will have a real impact – loss of life.

<u>Arkansas Act 861 and the Conflict with Federal Law</u>

107.    On or about April 24, 2025, Governor Sarah Huckabee Sanders Act 861, subtitled as an amendment to the "Revised Arkansas Gift Act; to allow certain classes of persons to revoke or amend an anatomical gift upon the death of the donor; and to require certain reporting of procurement organizations." Exhibit A.

108.    While Act 861 is only a few pages long, its impact on the existing federal framework for any organ donor who dies in the State of Arkansas is substantial.

109.    Act 861 adds Section 20-17-1228 to the RUAGA, "Rights of next of kin to modify, amend, or revoke an anatomical gift."

110.    The right of next of kin to modify, amend, or revoke an anatomical gift in section 20-17-1228 is both unclear as to who must consent before a decedent's lifetime decision to donate can be honored, when, if ever, the right to modify, amend, or revoke expires, and allows criminal and civil consequences for a mistaken decision to proceed with the donation.

111.    The absence of a deadline is not a clerical error.  For example, Act 861 provides that a person entitled to modify a gift loses that right if he is charged with the decedent's murder. *Id.* at § 20-17-1228(d)(1).  However, if the relative charged with murder is acquitted of the charges, "the right to modify, amend, or revoke a donor's anatomical gift is returned to the person." *Id.* at

#125125637v2

§ 20-17-1228(d)(1)(A)(ii).

112.    Act 861 provides at section 20-17-1228(b) that the right to modify, amend, or revoke begins "two (2) hours after the pronouncement of cardiac or asystolic death within a medical facility" but does not provide a deadline by which the right must be exercised.

113.    Act 861 provides a long list of classes of relatives that can modify, amend or revoke an anatomical gift, beginning with the spouse of a donor, and ending with an eighth level of cousins who by majority rule can overrule the decedent's decision to become an organ donor.  Ark. Code Ann. § 20-17-1228(b)(1)-(8).

114.    While section 20-17-1228(c)(1) purports to "vest" a majority of a class of the decedent's kin with the right to modify, amend, or revoke an anatomical gift on the decedent's behalf, no hierarchy to the list is provided,  such that a vesting in the first level would not eliminate the requirement to consult kin belonging to the next seven classes listed in Act 861.

115.    This means that no real finality exists with an anatomical gift from the State of Arkansas, because the gift can be revoked at any time.

116.    While the federal regime and standard clinical practice requires a rapidly moving system where a recipient may be prepared for surgery immediately upon offer and acceptance of an organ, Act 861 expressly allows for a situation where a relative is charged with murder, goes through the entire criminal discovery process, and then has a trial where he or she prevails – which could be years later – would suddenly have the right to revoke a gift made years earlier.

117.    Although Act 861 at section 20-17-1228(f) makes hospitals, clinics, physicians, healthcare providers, funeral directors, and funeral homes immune, it provides no immunity for OPOs charged with administering the system or the donor's kin.  By comparison, RUAGA provided immunity for all persons acting in good faith to comply with RUAGA.  Ark. Code Ann.

20

#125125637v2

§ 20-17-1218(a).

118.    As to the family members, this is particularly disturbing because less than a majority of surviving relatives can make a donation decision if they "have used reasonable efforts to notify all other members of the class of their instructions and are not aware of any opposition to those instructions on the part of more than one-half (1/2) of all surviving children." Ark. Code Ann. § 20-17-1228(c)(1).

119.    Therefore, faced with the loss of a close family member, the family member who ultimately makes the donation decision has a duty to: (1) determine their class; (2) try to contact as many people as possible in that class; (3) and accurately reflect each class member's wishes while dealing with the loss of a loved one; and (4) in the event the decisionmaker cannot reach a majority of relatives, make a determination as to whether her efforts in contacting every relevant person was "reasonable."

120.    To make this even worse, Act 861 does not even make clear whether a relative in a different "class" also has the power to revoke a gift, thus calling into question whether any family member ever truly has the authority to ratify an anatomical gift in Arkansas.

121.    Section 20-17-1229 of Act 861 requires additional reporting by OPOs be made to the Arkansas Legislative Council concerning organs recovered, funding, and number of instances of revocation under 20-17-1228 (a) and (b), and that OPO executives may be subject to questioning by the Arkansas Legislative Council.

122.    Failure to timely provide the Arkansas Legislative Council with information shall result in the OPOs charter being revoked by the Secretary of State and the OPO shall be barred from engaging in organ procurement within the state. Ark. Code Ann. § 20-17-1229. However, the determination of what OPO recovers organs in a federally-defined service is entirely reserved

to the federal government.

123.    The tremendous uncertainty and lack of finality caused by Act 861 disrupts the entire federal organ donation scheme in clear violation of federal law.

## COUNT I:
## DECLARATORY JUDGMENT (FEDERAL PREEMPTION)

124.    Plaintiffs re-allege and incorporate by reference all the above paragraphs as if they were fully set forth herein.

125.    The Supremacy Clause states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

126.    Under the Supremacy Clause, state law is preempted whenever federal law imposes restrictions or confers rights on private actors and a state law confers rights or imposes restrictions that conflict with the federal law. *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018)).

127.    When Congress intends federal law to occupy a field, state law in that area is preempted. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

128.    Even if Congress has not occupied the field, state law is naturally preempted to the extent that there is any conflict with a federal statute. *Id.*

129.    Accordingly, where a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, that state law is preempted.

130.    The United States Constitution's Commerce Clause vests Congress with the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3.

131.    Congress, using its Commerce Clause power, created the national organ transplant

#125125637v2

system.

132.    Congress vested in OPOs and the OTPN with the power to accept gifts of organs recover organs, maintain the national list of organ donor recipients, and coordinate the transplantation of organs to those on the national list of organ donor recipients.  42 U.S.C. §§ 273-274.

133.    For example, Congress has charged the OPTN with "establish[ing] . . . a national system . . . to match organs and individuals included on a [National Organ Donation] list." *Id.* at § 274.

134.    Pursuant to those regulations, the OPTN has a regulatory duty to "avoid wasting organs . . . and to promote the efficient management of organ placement[.]" 42 C.F.R. § 121.8(5).

135.    The regulations further vest OPTN with responsibility of "developing . . . policies within the mission of the OPTN . . . including . . . [p]olicies for the equitable allocation of cadaveric organs[.]" 42 C.F.R. § 121.4 (a)(1).

136.    In order to administer this system, Congress established OPOs as the sole organizations that can procure organs for donation.  42 U.S.C. § 273(b)(3).

137.    Act 861 interferes with the accomplishment and execution of NOTA – and the entire federal system writ large – because it creates confusion and uncertainty in the national organ donation system to the point where an OPO cannot rely on an Arkansas gift being true and final because Act 861 allows for post-mortem revocation of a testamentary gift for an indefinite amount of time by an indefinite number of relatives.

138.    Prior to the passage of Act 861, all 50 states had laws that forbid the revocation of a testator's intent to donate and laws that clearly defined when a relative had statutory authority to opt-in to organ donation on the decedent's behalf if the decedent had not elected to become a

#125125637v2

donor.

139.    No state law *has ever* undermined the finality of a donation inherent in the "national system . . . to match organs and individuals included on a [National Organ Donation] list." *Id.* at § 274.

140.    To compound this glaring issue, Act 861 removes OPOs from the group of individuals who receive immunity for good-faith compliance with relevant organ donation laws, even though prior version of Arkansas law and the laws of all other states contain immunity provisions for OPOs.

141.    Act 861 therefore creates a regime whereby the OPOs charged by Congress with facilitating that national system perform their duties at their own risk with each and every Arkansas resident who chooses to be an organ donor, never knowing when or by whom a gift may be revoked.

142.    Act 861 adds state reporting requirement for OPOs, which include reporting and questioning on revocations under section 20-17-1229(b), under threat of barring OPOs from operating within Arkansas if OPOs do not provide timely information.

143.    The federal government already has extensive reporting requirements for OPOs and Act 861's attempt to create additional reporting requirements usurps the federal government's role as the regulator of OPOs.  This is exacerbated by the fact that Act 861 requires reporting on the specific aspect of Act 861 that is at issue in this case and most conflicting with federal law.

144.    Act 861's penalty of barring an OPO from recovering organs from Arkansas is also in direct conflict with federal law because it is CMS alone, through Congress and NOTA, that may designate whether an OPO may operate in a given DSA – not Arkansas.

145.    Act 861's penalty of barring an OPO from recovering organs from Arkansas would

24

interfere with the national system by effectively eliminating the only entity federally designated to act as an OPO within an Arkansas DSA covering a significant majority of Arkansas's counties.

146.    Under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57, this Court is empowered to award declaratory judgment in favor of the Plaintiffs, declaring Act 861 to be in violation of Congress's authority under the Commerce Clause and the Supremacy Clause.

147.    This Court is empowered under *Ex parte Young*, 209 U.S. 123 (1908) and Federal Rule of Civil Procedure 65 to award injunctive relief to the Plaintiffs, enjoining the Defendants from enforcing Arkansas Act 861.

148.    Accordingly, Plaintiffs are entitled to a declaration that Act 861 is preempted by federal law and is enjoined from going into effect.

## COUNT II
## DECLARATORY JUDGMENT (VIOLATION OF THE DORMANT COMMERCE CLAUSE)

149.    Plaintiffs re-allege and incorporate by reference all the above paragraphs as if they were fully set forth herein.

150.    Congress, using its Commerce Clause power, created the national organ transplant system.

151.    The Commerce Clause vests Congress with the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3.

152.    "Although the Clause is framed as a positive grant of power to Congress, [courts] have long held that this Clause also prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514, (2019) (cleaned up) (citation omitted).

#125125637v2

153. A state violates the so-called dormant Commerce Clause by "(1) clearly discriminat[ing] against interstate commerce in favor of in-state commerce, (2) impos[ing] a burden on interstate commerce that outweighs any benefits received, or (3) ha[ving] the practical effect of extraterritorial control on interstate commerce." *Styczinski v. Arnold*, 46 F.4th 907, 912 (8th Cir. 2022) (cleaned up) (citation omitted).

154. Here, Act 861 violates the Dormant Commerce clause by "impos[ing] a burden on interstate commerce that outweighs any benefits received." *Id.*

155. As a practical matter, organ donations from Arkansas residents will no longer be received by the federal system established by Congress because, among other things, the gift can be revoked for an indefinite amount of time by an undefined number of people with criminal and civil consequences for acting on a mistaken belief that a donation has become final.

156. Conversely, it is impossible to say what kind of benefit Arkansians would receive from such an unjust law.

157. The national waitlist of those awaiting organ transplants currently consists of 103,000 Americans, of which 359 are waiting for a life-saving transplant in Arkansas.

158. 144 of the 359 Arkansans have been waiting between one and five years already.

159. Despite the efficient operation of the system and the generosity of the American public in donating organs, the organ shortage in the United States currently results in 13 deaths per day.

160. These harms will only be amplified by the passage of Act 861.

161. Furthermore, Act 861 takes the unprecedented step of disallowing organ donors in Arkansas from definitively making a testamentary gift without risking that their relatives will undo their wishes after they die.

#125125637v2

162. Such a blatant disregard for the will of a testator is a burden, not a benefit.

163. The imprecise non-clinical language of Act 861 as it applies its revocation process to "pronouncement of cardiac . . . or . . . asystolic death" leads to situations where the disruptive harm and waste caused by Act 861 will always be maximized.

164. When an organ donor is expected to have their death declared by cardiac criteria, the removal of life-support happens in an operating room or an adjacent location in close proximity. If and when the patient's heart stops beating on its own, they are pronounced dead by circulatory (or "cardiac") means. Act 861 states that the gifts of all documented donors whose deaths are declared by cardiac means are contingent on some form of third-party affirmation or ratification that cannot begin until two hours have passed since that was declared – effectively, two hours after removal of the organ has begun. It is not clear in this context what is meant by "asystolic," because the clinical state that this refers to happens both when death is diagnosed through cardiac means and when a brain-dead donor, who may have been declared dead days ago, is cross-clamped in preparation for organ recovery.

165. The majority of organ donors who die and go on to be post-mortem organ donors are declared dead by neurologic criteria. These individuals are brought into the operating room deceased, but with mechanical ventilation to preserve their organs for donation.

166. During recovery of organs from a donor declared dead by neurologic criteria, who has otherwise been put on mechanical ventilation which causes the heart to beat and the organs to be oxygenated, the mechanical ventilation is removed and the aorta is clamped. Although the wording of Act 861 is clinically imprecise, this removal and clamp seemingly is what is meant by "asystolic death."

27

167.    Due to the imprecise wording regarding the declaration of death, Act 861's revocation process for a donor declared dead via neurologic means would only start two hours after this clamping and removal, rather than when actual death was declared.

168.    In all cases of death subject to the revocation process envisioned by Act 861, the ability of third parties to revoke a donor's anatomical gift begins two hours after the surgical process to remove the donor's organs has begun.

169.    Creating the potential for revocation so far along into the process will create a danger to the organ recipient and wasted time and resources for OPOs, hospitals, families, and patients, presenting an undue burden on interstate commerce because the time to revoke an anatomical gift might not even start until a recipient in another state is prepared for surgery.

170.    Act 861 creates new reporting burdens for OPOs operating within Arkansas as well as related penalties which would bar an OPO from operating within the state, the event of which would burden interstate commerce by effectively halting organ donation within Arkansas, impacting the national supply of organs.

171.    Act 861 is facially invalid and cannot go into effect because it violates the dormant Commerce Clause of the United States Constitution.

172.    Under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57, this Court is empowered to award declaratory judgment in favor of the Plaintiffs, declaring Arkansas Act 861 to be in violation of Congress's authority under the Commerce Clause.

173.    Accordingly, Plaintiffs are entitled to a declaration that Act 861 is preempted and an Order enjoining Act 861 from going into effect.

28

## COUNT III
## DECLARATORY JUDGMENT (VIOLATION OF THE DUE PROCESS CLAUSES OF THE UNITED STATES AND ARKANSAS CONSTITUTIONS)

174.   Plaintiffs re-allege and incorporate by reference all the above paragraphs as if they were fully set forth herein.

175.   The United States Constitutions guarantees that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law..." U.S. Const. amend. XIV, §1.

176.   A state violates procedural due process when there is a deprivation of life, liberty, or property without sufficient due process. *Hughes v. City of Cedar Rapids, Iowa*, 840 F.3d 987, 994 (8th Cir. 2016).

177.   Similarly, the Arkansas Constitution guarantees that "[n]o person shall be . . . in any manner destroyed or deprived of his life, liberty or property, except by the judgment of his peers of the law of the land..." Ark. Const. Art. 2, § 21.

178.   The fundamental requirements of due process guaranteed under the Arkansas Constitution require the opportunity to be heard at a meaningful time and in a meaningful place before a person may be deprived of property. *Franklin v. State*, 267 Ark. 311, 316 (1979).

179.   Accordingly, the Arkansas Constitution guarantees that no person shall be deprived of property without due process of law. *Convent Corp. v. City of N. Little Rock*, 2021 Ark. 7, 18 (2021).

180.   A valid due process claim consists of: action under color of state law; a right, privilege, or immunity secured by the Arkansas Constitution, such as a property right; a loss of a right amounting to a deprivation; and an absence of due process. *City of Little Rock v. Alexander Apartments, LLC*, 592 S.W.3d 224, 230 (Ark. 2020).

#125125637v2

181.    Act 861 is a violation of the due process clauses of the United States and Arkansas Constitutions because it deprives the donor and their closest family of property rights without any due process.

182.    Act 861 constitutes action under color of state law taken by the Arkansas state legislature and Governor Sanders.

## Decedent

183.    Arkansas recognizes that the right of ownership carries with it the full power to dispose of property. *Bernstein v. Bramble*, 81 Ark. 480 (1907).

184.    Further, Arkansas recognizes the right of a testator to dispose of their property in any manner which they deem appropriate. *Dykes v. Dykes*, 294 Ark. 158, 160 (1987).

185.    Over 1.5 million Arkansans are registered as organ donors. These people chose to make an anatomical gift of their organs after death, should their organs be viable for donation.

186.    It can hardly be disputed that a person has a property interest in their body during life.

187.    Accordingly, it follows that a person has the right to dispose of their property in the manner they deem appropriate, including the making of an anatomical gift of their organs.

188.    Act 861 seeks to deprive more than 1.5 million Arkansans of this property right of disposal without any sufficient due process under the United States and Arkansas Constitutions.

189.    As it stands, Act 861 will allow a decedent's final wish – for any viable organs to be used to prolong the life of another person – to be usurped by any person in the line of succession. These usurpations are being made in the haze of grief and loss, when people often make decisions they later regret.

30

190. There can be no sufficient due process for the donor, as there is no court intervention available from beyond the grave.

191. Accordingly, Plaintiffs are entitled to a declaration that Arkansas Act 861 unconstitutionally violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution and the Arkansas Constitution.

## Next of Kin

192. Arkansas law recognizes that next of kin have a quasi-property right in the body of a decedent. *Teasley v. Thompson*, 165 S.W.2d 940, 941 (Ark. 1942).

193. Specifically, next of kin have "the primary and paramount right to possession of the body and to control the burial or other legal disposition thereof." *Id.*; *see also Arkansas Bd. of Embalmers and Funeral Directors v. Reddick*, 366 Ark. 89, 94 (2006) (recognizing the right of next of kin to decide what is to be done with a decedent's remains).

194. This right to control the disposition of a dead body arises out of the next of kin's duty to bury the dead. *Travelers Ins. Co. v. Smith*, 338 Ark. 81, 89 (1999).

195. This right of the next of kin forms the basis of a constitutionally protected interest in the decedent's body. *Waeschle v. Dragovic*, 576 F.3d 539, 545-46 (6th Cir. 2009) (citing *Brotherton v. Cleveland*, 923 F.2d 477, 478-482 (6th Cir. 1991)); *see also Whaley v. Cty. Of Tuscola*, 58 F.3d 1111, 1116 (6th Cir. 1995) (recognizing that next of kin have the right to choose to make "a gift of all or part of a decedent's body, at least when there is no contrary intent evidenced by the decedent") (emphasis added).

196. RUAGA expanded the quasi-property rights of next of kin to make an anatomical gift of a decedent's body. *See Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 384 (Tex. 2012).

31

197.    Act 861 deprives the next of kin of this primary and paramount right by vesting the ability to modify, amend, or revoke a decedent's anatomical gift in people who are lower in the chain of succession. Ark. Code Ann. § 20-17-1228(b).

198.    Act 861 creates an ambiguity as to who holds the right to determine donor status of a decedent's body by listing eight classes who may modify, amend, or revoke a decedent's anatomical gift without reference to any order by which the decision may be made. Ark. Code Ann. § 20-17-1228(b)(1-8).

199.    While Act 861 lists persons or classes of persons who would be a decedent's next of kin (*i.e.*, the spouse of the donor), Act 861 continues to list other persons or classes of persons who would not be a decedent's closest family member.

200.    Further, Act 861 allows any person who could inherit the estate of the donor under the laws of descent and distribution to modify, amend, or revoke a decedent's anatomical gift despite the decision of a person higher in the chain of succession. Ark. Code Ann. § 20-17-1228(b)(8).

201.    Act 861 affects the closest kin's right to control the legal disposition of a decedent's body without providing for due process by which the closest kin can challenge the decision of an inferior class to modify, amend, or revoke a decedent's anatomical gift.

202.    Accordingly, Plaintiffs are entitled to a declaration that Act 861 unconstitutionally violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution and the Arkansas Constitution.

**<u>COUNT IV</u>**
**DECLARATORY JUDGMENT (VIOLATION OF THE EQUAL PROTECTION CLAUSES OF THE UNITED STATES AND ARKANSAS CONSTITUTIONS)**

#125125637v2

203.    Plaintiffs re-allege and incorporate by reference all the above paragraphs as if they were fully set forth herein.

204.    The United States Constitution states, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

205.    Likewise, the Arkansas Constitution states, "[t]he equality of all persons before the law is recognized, and shall ever remain inviolate; nor shall any citizen ever be deprived of any right, privilege or immunity; nor exempted from any burden or duty, on account of race, color or previous condition." Ark. Const. art. II, § 3.

206.    The Equal Protection Clause prohibits classifications that have no rational basis and are not reasonably related to a legitimate government purpose. *See Graves v. Greene Cnty.*, 430 S.W.3d 722, 727 (Ark. 2013).

207.    Where a statute creates a classification, that "classification must not be arbitrary and must have a fair and substantial relationship to the purposes requiring such classification." *Burt v. Arkansas Livestock & Poultry Comm'n*, 644 S.W.2d 587, 589 (Ark. 1983).

208.    Act 861 violates Equal Protection under the United States and Arkansas Constitution because it treats individuals who have made a testamentary gift of their organs while alive differently from those individuals who did not do so.

209.    When a person who did not make an anatomical gift dies, RUAGA mandates that the highest ranking person reasonably available in RUAGA's list be given the opportunity to decide. That person's decision is final, and actionable because the list is time limited and hierarchic.

210.    In contrast, when a person who made an anatomical gift dies, Act 861 expressly allows an extensive list of third parties to overrule that gift. That valid gift includes, but is not

#125125637v2

limited to, those who have chosen to be organ donors in conjunction with their estate planning, in an advance directive, on the DonateLife America "registerMe" app, or through their driver's license at the Arkansas DMV.

211.    For the 65% of Arkansans who actually make a testamentary gift, this means their absolute right to have their organs recovered and transplanted is eliminated by Act 861's right to modify, amend, or revoke the gift, which precludes successful transplant.

212.    For the 35% of Arkansans who die without having made a gift, their gifts have the benefit of a clear and time limited process, whereby the highest person reasonably available makes a final, binding and actionable decision.

213.    Individuals may make their anatomical gift while alive to protect their survivors from having to make difficult decisions at the time of death. The decision is also as confidential as one wishes it to be, so that a donor may make a decision independent of pressure or the desires and beliefs of other family members or friends, and with or without informing them and with or without a visible symbol on the license.

214.    A gift made by the donor while alive is so effective because they provide the clearest expression of the donor's intent, and their irrevocable nature under RUAGA currently allows OPOs to focus resources and time on other elements of the process to ensure successful organ donation and transplant.

215.    The faster a confirmation that a gift is authorized occurs, the sooner an OPO can move forward with organ testing, allocation and recovery, ranging from hours to days earlier. It also allows OPO interaction with the family to focus on their own next steps in the grieving process, including gathering for good-byes, the planning of honor walks or flag-raising at the hospital, funeral arrangements post-organ or tissue recovery, and their personal needs.

#125125637v2

216.    There is no rational basis for why under Act 861 donors who have made the clearest, strongest effort to make a testamentary anatomical gift are most at risk for having their anatomical gifts amended or revoked. Act 861 undermines the most effective means of anatomical gift giving, which directly contradicts the stated goals of the United States and Arkansas in encouraging the life-saving act of organ donation.

217.    Accordingly, Plaintiffs are entitled to a declaration that Act 861 unconstitutionally violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and the Arkansas Constitution.

## COUNT V
## DECLARATORY JUDGMENT (ACT 861 IS VOID FOR VAGUENESS UNDER THE UNITED STATES AND ARKANSAS CONSTITUTIONS)

218.    Plaintiffs re-allege and incorporate by reference all the above paragraphs as if they were fully set forth herein.

219.    To survive a vagueness challenge, a law must provide fair warning by "giv[ing] the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972).

220.    Arkansas Courts have held that a statute is impermissibly vague "where sections [of a statute] are in hopeless conflict that one section should be stricken[.]" *McLeod v. Santa Fe Trail Transp. Co.*, S.W.2d 413, 415-6 (Ark. 1943).

221.    Act 861 is entirely ambiguous as to who has the ultimate authority to amend, revoke, or modify and gift and when that decision is final.

222.    The imprecise and vague use of clinical terms by Act 861 with regard to when "cardiac" or "asystolic death" is declared, creates uncertainty of when the right to modify, amend, or revoke begins and further muddies any understanding of how Act 861 will work in practice.

35

#125125637v2

223.    The undefined use of the term "medical facility" makes Act 861 even more impossible to navigate as an OPO.  In the practical reality of organ donation, deaths of donors occur in nursing homes, hospices, ambulances, and doctor's offices.  Act 861's use of the term "healthcare facility" is undefined, and therefore the applicability or timing of Act 861's right to modify, amend, or revoke to these other situations is entirely unclear.

224.    To add to the issue, Act 861 removes OPOs from those having immunity for complying with RUAGA in good faith.

225.    Arkansas law criminalizes removing or dissecting a corpse "except authorized by law." Arkansas Code Ann. § 5-60-101.  Because Act 861 makes it unclear when OPOs have the authority to accept a gift and who has authority to authorize that gift, every single organ recovery from an Arkansas donor will expose an OPO to potential criminal prosecution.

226.    Thus, because Act 861 is impermissibly vague as to who has the ultimate authority to modify, amend, or revoke a gift and when that authority starts and ends, OPOs face potential criminal liability for performing their federally authorized duties of administering the organ donation system.  Act 861 should be enjoined for this reason as well.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a.      Declare that Act 861 is preempted by federal law;

b.      Declare that Act 861 violates the Constitution's dormant Commerce Clause;

c.      Declare that Act 861 unconstitutionally violates the Due Process Clause of the Fourteenth Amendment of the United States and Arkansas Constitutions;

d.      Declare that Act 861 unconstitutionally violates the Equal Protection Clause of the Fourteenth Amendment of the United States and Arkansas Constitutions;

36

e.  Declare that Act 861 is void for vagueness;

f.  Preliminary and permanently enjoin Defendants, as well as all officers, agents, and employees subject to their supervision, direction, or control and any successors in office and all persons acting in concert with them from taking any action to enforce Act 861;

g.  Award Plaintiffs their attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful claims against state officials under 42 U.S.C. § 1983 and Ark. Code Ann. § 16-123-105(b) for successful claims against state officials under Ark. Code Ann. § 16-123-105(a); and

h.  Award Plaintiffs all other relief as the Court deems just and proper.

Dated: August 5, 2025

E. B. Chiles IV, Ark. Bar No. 96179
J. Houston M. Downes, Ark. Bar No. 2023149
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
(501) 379-1700 (telephone)
(501) 379-1701 (facsimile)
cchiles@qgtlaw.com
hdownes@qgtlaw.com

David Smith, Pa. Bar No. 21480
David Rodkey, Pa. Bar No. 325698
DILWORTH PAXON LLP
1650 Market Street, Suite 1200
Philadelphia, Pennsylvania 19103
(215) 575-7000 (telephone)
(215) 754-4603 (facsimile)
dsmith@dilworthlaw.com
drodkey@dilworthlaw.com

37

#125125637v2

Christina Strong, N.J. Bar No. 026721988
DILWORTH PAXON LLP
2 Research Way
Princeton, New Jersey 08540
(908) 217-1053 (telephone)
(215) 893-8537 (facsimile)
cstrong@dilworthlaw.com

*Attorneys for Plaintiffs*

#125125637v2