IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| **SOUTHERN LEGACY OF LIFE;** <br> **JULIE BARBER** <br><br> **Plaintiffs,** <br><br> v. <br><br> **COLE JESTER, in his official capacity as Secretary of State, et. al.** <br><br> **Defendants.** | No. 4:25-cv-773-JM |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs Southern Legacy of Life and Julie Barber submit this Supplemental Memorandum of Law in Support of Their Amended Preliminary Injunction/Temporary Restraining Order.[1]

## I.   INTRODUCTION

Plaintiffs have demonstrated that:

A.   Plaintiffs will suffer irreparable harm absent preliminary relief because Act 861 will result in certain death of individuals awaiting organ transplants, renders impracticable Arkansas's participation in the national organ donation system, violates the constitutional rights of Arkansas residents, and jeopardizes the individuals tasked with administering the organ donation system with criminal and civil liability.

B.   Plaintiffs have a high likelihood of success on the merits for the following reasons:

---

[1] Abbreviations used in this Reply have the same meaning as those in Plaintiffs' opening brief.

#125335480v1

1. Act 861 is preempted by federal organ donation laws and regulations because Act 861 obstructs the purposes and objectives of Congress;

2. Act 861 violates the Dormant Commerce Clause because it imposes an undue burden on interstate commerce that outweighs local benefits;

3. Act 861 allows third parties to undo the express will of Arkansas testators post-mortem while providing no mechanism to protect decedents' property rights in violation of the Due Process Clause of the federal and Arkansas constitutions;

4. Act 861 treats organ donors differently from those who choose not to be organ donors in violation of the Equal Protection Clause of the federal and Arkansas constitutions; and

5. Act 861 is too ambiguous to be enforced and hence is void for vagueness.

C. The remaining factors weigh in favor of granting an injunction.

1. The threatened harm to Plaintiffs outweighs the threatened harm to Defendants should an injunction be granted; and

2. The public interest strongly favors an injunction.

Plaintiffs reply to three arguments and one omission of Defendants in their Supplemental Brief (Document 42):

First, Defendants continue to rely on Eleventh Amendment immunity, despite that Act 861, at section 20-17-1228(f), excludes OPOs and family members who carry out a decedent's organ donation gift from immunity from criminal and civil liability. In a change from their previous position, Defendants now admit that they may seek to enforce Act 861 through the criminal statute concerning abuse of a corpse and other means. *See* D. Supp. Br. at 2, 3 ("Defendants have not scoured all Arkansas statutes and make no assurances regarding what their enforcement authority

may be to enforce other laws against Plaintiffs ….").[2]  Further, Defendants have never attempted to explain why the Secretary of State, who expressly has authority to enforce Act 861, is not a proper defendant against whom all of the relief requested can be asserted.

Second, contrary to the evidence, Defendants argue that giving eight categories of individuals the right to revoke a decedent's previously irrevocable organ donation gift somehow allows the "donation decision to better reflect his or her intention before he or she passes away …" D. Supp. Br. at 5.  The evidence shows that the organ donation decision is informed by deeply held beliefs and experiences.  There is no evidence in the record to support Defendants' argument that lifetime organ donation decisions are poorly informed or fail to implement the prospective donor's intent.

Third, Defendants argue that Act 861 "gives organ procurement organizations two hours to procure the donor's organs, *which again respects the donor's wishes*," after which anything not removed within the two-hour window has not been accepted by the intended recipient and is subject to revocation.  D. Supp. Br. at 6 (emphasis added).  But nothing in the evidentiary record, Arkansas law, or logic supports this argument:  The decedent has donated organs and tissue without restriction, and it has long been recognized that the donation is accepted no later than when the first cut is made or a potential recipient is prepared to receive a transplant. Ark. Code Ann. § 20-17-1210(c) ("A revocation . . . is effective *only if, before an incision has been made* to remove a part from the donor's body or before invasive procedures have begun to prepare the recipient, the procurement organization, transplant hospital, or physician or technician knows of the revocation."

---

[2] As Defendants put it in their Supplemental Brief, at 3, "During the Court's colloquy with Plaintiffs' counsel, however, the Court indicated that it may have understood Defendants as promising to not enforce other laws that are not challenged by Plaintiffs in this suit, such as the abuse-of-corpse statute."  But the transcript is clear that Defendants changed position on this critical issue: "THE COURT: Are there any circumstances under which anyone could be held criminally liable under anything having to do with this act? MR. HALE: No."  PI Tr. 154:22–25.

3

(emphasis added)). There is no evidence that the donor intended an arbitrary two-hour deadline or to donate only those organs and tissue that can be removed within two hours. To the contrary, the evidence shows that individuals making lifetime organ donation decisions imposed no such restrictions and wanted to benefit as many potential recipients as possible without arbitrary deadlines and interference by others. Decades of federal organ donation practice and Arkansas gift law, to the extent it applies, are consistent.

Fourth, Defendants add to the vagueness and internal contradictions within Act 861 by arguing meanings of Act 861 that are not supported by the language of the Act and then contradicting their own arguments with implicit threats. For example, regarding the immunity of OPOs and family members from criminal prosecution and civil liability, Defendants first argue that, despite that the omission of OPOs and family members from Section 20-17-1228(f) (the immunity provision of Act 861), OPOs and family members somehow are protected by prior law found in Section 20-17-1218(a). Earlier Defendants said, "Plaintiffs are immune from criminal prosecution and civil liability for good-faith violations of Act 861 via section -1218(a)'s immunity provision." D. Mot. to Dismiss & Resp. in Opp. to P. Mot. for Prelim. Inj., at 2 (Document 27). But in their Supplemental Memorandum, Defendants never mention Section 1218(a), reserve their right to prosecute violations of Act 861 for abuse of a corpse (among other things), and take no position on whether a private right of action exists under Act 861. D. Supp. Br. at 6. Similarly, ambiguity and confusion remain over whether the list of eight categories of individuals empowered by Act 861 to overrule a decedent's lifetime organ donation decision is hierarchical such that a vesting in the first level negates the requirement to consult those belonging to the next seven classes. Defendants asserted at one point that the list is hierarchical, but, as we have seen, that does not preclude them from taking a different position at another time.

II.     **ARGUMENT**

     A. **The *Ex parte Young* Exception Applies Because Defendants Concede That They Have "Some Connection" to the Enforcement of Act 861 and Their Contention That a Statute Must Have an Enforcement Mechanism to Trigger *Ex parte Young* Is Wrong.**

Defendants have consistently taken the misguided position that the *Ex parte Young* exception to sovereign immunity applies to state actors only when the challenged statute provides the defendant with a specific enforcement mechanism. *See, e.g.*, D. Sup. Br. at 4. As made clear by the primary case upon which Defendants rely, "[t]he method of enforcement <u>can arise out of 'the general law'</u> *or* be 'specially created by the act itself.'" *Bio Gen LLC v. Sanders*, 142 F.4th 591, 604 (8th Cir. 2025) (emphasis added) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). Applying the correct standard, none of the Defendants is immune from this suit.

First, the Attorney General and the State Prosecutors have now "made no assurances regarding what their enforcement authority may be to enforce [Act 861 through] other laws against Plaintiffs[.]" D. Sup. Br. at 2. This retraction makes even clearer the applicability of *Ex parte Young*. "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (citations omitted) (brackets and quotation marks omitted). "So long as a state official is giving effect to a state statute in a manner that allegedly injures a plaintiff and violates his constitutional rights, an action to enjoin implementation of the statute or for declaratory relief is available against the state official." *McDaniel v. Precythe*, 897 F.3d 946, 952 (8th Cir. 2018) (citations omitted). "There need not be an enforcement proceeding." *Id.* Now that the Attorney General and State Prosecutors have admitted that they can "giv[e] effect" to Act 861 through other statutes "in a manner that [will] injur[e] a plaintiff[,]" they are not entitled to immunity.

This reasoning comports with the Supreme Court's recent decision in *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021). In *Whole Woman's Health*, the challenged statute allowed for only "private civil actions" and did not provide for an enforcement mechanism that could be exercised by a state official. *Id*. The majority expressly rejected the argument that a statute that does not include an enforcement mechanism must fall outside the ambit of *Ex parte Young*:

> [A dissenting Justice] suggests that the licensing-official defendants lack authority to enforce S. B. 8 because that statute says it is to be "exclusively" enforced through private civil actions "[n]otwithstanding ... any other law." See Tex. Health & Safety Code Ann. § 171.207(a). But the same provision of S. B. 8 *also* states that the law "may not be construed to ... limit the enforceability of any other laws that regulate or prohibit abortion." § 171.207(b)(3). This saving clause is significant because, as best we can tell from the briefing before us, *the licensing-official defendants are charged with enforcing "other laws that regulate ... abortion*.

*Id.* at 46 (emphasis added).

Act 861, just like the law at issue in *Whole Woman's Health*, can be enforced by the Attorney General and the State Prosecutors through "other laws that regulate [organ donation]," as Defendants now concede. D. Sup. Br. at 2, 4. Given that enforcement authority through, among other things, the abuse-of-a-corpse statute (Ark. Code Ann. § 5-60-101), under which Defendants now acknowledge that OPOs face a threat of criminal prosecution simply for performing their federally mandated duties, the Attorney General and State Prosecutors can and should be enjoined. *See also Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 863–64 (8th Cir. 2006) (Noting that the Nebraska Attorney General and Governor were proper parties charged with enforcing a provision of the Nebraska Constitution defining marriage as "between a man and a woman" because, "[u]nder Nebraska Law, the Governor and the Attorney General have broad powers to enforce the State's Constitution and statutes."), *abrogated on other grounds by Obergefell v. Hodges*, 576 U.S. 644 (2015).

The Secretary of State can clearly be enjoined under *Ex parte Young* because he has express enforcement authority. Act 861 provides that "[a] private procurement organization that fails to

6

timely report pursuant to this section shall have its charter revoked by the Secretary of State and shall be barred from engaging in organ procurement within this state." Ark. Code Ann. § 20-17-1229(c). While the Defendants attempt to minimize this enforcement by claiming that it only applies to the reporting requirement, an OPO must produce in its report, among other things, data regarding how many modifications, amendments, and revocations of anatomical gifts were made by next of kin. *Id.* at § 20-17-1229(a)(2)(E) & (F). This has the effect of compelling the OPO to administer all parts of Act 861, no matter how vague or unconstitutional, in order to generate the report required by Act 861. *Id.* The failure to provide that report *must* result in the Secretary of State barring the OPO from operating in Arkansas. *Id.* at § 20-17-1229(c).[3]

In sum, even if the Court were to find that the Attorney General and State Prosecutors are not proper Defendants, it should nevertheless order the full relief requested by Plaintiffs solely against the Secretary of State because the Secretary of State can revoke an OPO's ability to operate in Arkansas for not following and reporting its compliance with nearly every provision of Act 861.

**B. The Plain Language of Act 861 Belies Defendants' Attempt to Use Common Law to Clarify the Statute and Only Serves to Illustrate Why Act 861 is Void for Vagueness.**

During the preliminary injunction hearing, Defendants for the first time asserted that Act 861 does not allow revocation of an anatomical gift for any organ that can be procured within two hours of a donor's cardiac death or when a cross clamp is applied. PI Tran. at 32–33. According to Defendants, after two hours have passed, if a family member revokes the decedent's donation, the OPO must stop the process of procuring additional organs, retaining only those organs it has

---

[3] As noted in previous briefing, the Secretary of State cannot bar an OPO from operating in a state without directly conflicting with the federal statutory scheme. Specifically, Congress vested the Secretary of Health and Human Services with the sole authority to designate OPOs. 42 U.S.C. § 273(b)(1). Forcing OPOs to follow the aspects of Act 861 that conflict with the efficient administration of the federal organ donation scheme, which is nearly every aspect of it, and then providing a mechanism for Arkansas to revoke the OPO's ability to operate for not following those rules is preempted by federal law.

been able to completely procure during that two-hour window. *See generally* PI Tr. 167–175. Defendants argue (incorrectly) that this reading of Act 861 is supported by Arkansas common law, which it then argued could be used to remedy the problem that the text of Act 861 seems to allow revocation of an organ donation for an open-ended amount of time. *See* Ark. Code Ann. § 20-17-1228(b).

The Court correctly questioned how Arkansas common law could possibly allow the decedent to revoke a gift from beyond the grave:

> MR. HALE: I think that the gift is complete not the moment of death, but upon the time that the organ is removed from the body. I think that's when the gift is essentially complete.
>
> THE COURT: I don't want to belabor this, but you said as soon as the donor gives up dominion. And how does he exercise any more dominion from the time that he dies? That's what -- philosophically, how do you do that from the grave?
>
> MR. HALE: I understand Your Honor's concerns. I think that the -- I see what you're saying, but I think the way to read it though is that whatever has been essentially taken from the body, and I understand at that point the person's dead and I see your point that they don't have dominion at that point because they're dead.

*Id.* at 174:11–24.

Defendants have provided nothing in the Supplemental Brief to answer the Court's question, and their reading of the Act 861 against the supposed necessary backdrop of Arkansas common law is incorrect for at least three reasons. First, Act 861 supersedes existing law, so it is

8

unclear upon what basis anyone interpreting Act 861 would look to the common law at all. Second, even if one interpreting Act 861 looked to Arkansas common law, the result would be that an anatomical gift cannot be revoked post-mortem at all due to existing statutory laws. Third, even if someone viewed the cases cited by Defendants in a vacuum without any other authority, Defendants' position that only organs procured within two hours become irrevocable donations is wholly unsupported once the OPO has already accepted the gift of all transplantable parts.

To the first point, while Defendants twist themselves in knots to try to make sense of the impossible-to-apply standards set forth in Act 861, they provide no basis for why Act 861 does not simply supersede the common law of gifts. It is black letter law that a statute overrides common law when there is an irreconcilable conflict between the two. *See Shamlin v. Quadrangle Enters., Inc.*, 272 S.W.3d 128, 136 (Ark. App. 2008) (citing *Thompson v. Bank of Am.*, 157 S.W.3d 174 (Ark. 2004)). While Defendants cite Arkansas common law that states, for instance, "acceptance may be implied where the gift, otherwise complete, is beneficial to the donee," Act 861 expressly states, without limitation, "(2) hours after the pronouncement of cardiac or asystolic death within a medical facility, a donor's prior anatomical gift may be modified, amended, or revoked . . . ." D. Sup. Br. at 7 (quoting *Carter v. Greenway*, 238 S.W. 65, 67 (Ark. 1922)); Ark. Code Ann. § 20-17-1228(b). Act 861 expressly provides a donor's relative with the authority to revoke a gift post-mortem, including after an OPO has taken possession of the body and begun procuring life-saving organs, so there is simply no basis for common law to apply to define the circumstances in which a revocation cannot occur. Act 861 provides relatives with unfettered power to revoke a donation without limitation. That is an irreconcilable conflict with the common law, and Defendants provide no authority for why anyone would look to case law to clarify Act 861's plain language.

Next, assuming that the provision allowing the revocation of gifts after two hours did allow for interpretation in light of already-existing law, the Defendants provide no explanation as to why

9

#125335480v1

that source would be the common law. Indeed, the standard for whether a statute supersedes the common law is virtually the same as the standard for whether a statute supersedes statutory law, which is whether the two irreconcilably conflict. *See e.g.*, *Uilkie v. State*, 827 S.W.2d 131, 133 (Ark. 1992) ("[W]here the provisions of two statutes are in irreconcilable conflict with each other, there is an implied repeal by the latter one which governs the subject matter so far as relates to the conflicting provisions . . . ." (citations omitted)). There is ample statutory and regulatory law from which the court could interpret Act 861.

As explained in the testimony of Mark Tudor and the expert testimony of Richard Pietroski, prior to Act 861 there was an intricate procedure governed by federal law, federal regulations, OPTN policies, and numerous state laws about how the organ donation process must function. (The demonstrative chart used during the testimony of Richard Pietroski is attached as Exhibit A.) If Act 861 does not revoke existing gift law, which is inherit in the government's position that the common law somehow applies, then the proper place to look for how to interpret Act 861 is not the common law, but the existing statutory laws that Act 861 did not supersede.

To illustrate this point, consider the example of the Revised Arkansas Anatomical Gift Act ("RAAGA") on the Rights and Duties of Procurement Organizations and Others. Ark. Code Ann. § 20-17-1214. Subsection C states in relevant part that, "[w]hen a hospital refers an individual at or near death to a procurement organization, the organization may conduct any reasonable examination necessary to ensure the medical suitability of a part that is or could be the subject of an anatomical gift for transplantation . . . During the examination period, *measures necessary to ensure the medical suitability of the part may not be withdrawn unless the hospital or procurement organization knows that the individual expressed a contrary intent*." Ark. Code Ann. § 20-17-1214(c) (emphasis added). The notes on § 20-17-1214 state, "This examination typically is made in a relatively short period of time. During the examination period, measures necessary to ensure

10

the medical suitability of a part cannot be withdrawn from the individual who was referred to the procurement organization unless the procurement organization or hospital knows that individual expressly provided to the contrary." *Id.* (Comments). Therefore, to the extent that Act 861 does not supersede the common law of gifts, it is entirely unclear why it would supersede, among other things, RAAGA. If one looks to RAAGA to fill in the gaps of Act 861, consent to a donation cannot be withdrawn (absent a mistake regarding the donor's consent) after an *examination* of the organs has started, not an extraction of each individual organ. Defendants' position that an OPO must procure organs as quickly as possible is completely unfounded. *See also* Ark. Code Ann. § 20-17-1210(c) (preventing revocation after a cut has been made on the donor's body).

       Third, even if one looks only at the cases cited by Defendants, they do not in any way stand for the proposition that *organs* that are not procured within two hours can be withdrawn from an OPO rushing to extract them in order to save another's life. To that end, Defendants do not in any way explain how broad common law propositions (for example, that a "gift is complete when donor 'surrender[s] possession and dominion [of the gift] to the donee[,]'") lead to their conclusion that organs that have not been completely removed from a body can be reclaimed after two hours. D. Sup. Br. at 7 (quoting *Bryant v. Parker*, 66 S.W.2d 1061, 1062 (Ark. 1934)). Instead, the cases they cite stand for the proposition that, when a donor relinquishes possession and control of a gift, that a gift is finalized. *See Bryant*, 66 S.W.2d at 1062 ("To consummate a gift, whether inter vivos or causa mortis, the property must be actually delivered, and the donor must surrender the possession and dominion thereof to the donee."). The proper reading of the cases cited by Defendants is that, once an OPO takes possession of a donor's *body*, the gift cannot be revoked because possession and dominion have already been relinquished. As the Court correctly pointed out during its colloquy, a donor can hardly continue to exercise dominion after death. PI Tr. at 174:11–24.

Indeed, if common law is utilized to determine when the gift made by the donor is accepted and therefore irrevocable, the inflection point comes much earlier, after the OPO has taken substantial steps in reliance of the gift. The Court heard considerable testimony regarding the federally mandated activities the OPO undertakes from the time a patient is referred to it. RAAGA mandates that not only donors but also preliminarily clinically suitable individuals who have not actually refused donation are deemed "prospective donors,"[4] and OPOs are permitted by state law, and required by federal law, to commence record review and suitability testing. Hospitals are required to enable the donation option by maintaining ventilation. And when the OPO and hospital have performed these actions in reliance on the donor's gift, the OPO then begins the labor-intensive work of allocating the organs, assembling an organ recovery team, transporting those surgeons to the hospital, and recovering the organs. All of this time-consuming and costly work is done in reliance that a gift has been made, and, if common law applies, these actions constitute detrimental reliance such that the gift cannot be revoked. *See, e.g.*, *Rigsby v. Rigsby*, 149 S.W.3d 318, 322 (Ark. 2004) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." (citations omitted)).

Accordingly, under the common law, detrimental reliance on the part of the OPO occurs much earlier, during the pre-surgical stage of the process when the OPO begins taking costly steps in reliance of the gift. In terms of the donation and transplant process explained by Richard Pietroski, the OPO actions described in Steps 4 through 10, involving record review, testing,

---

[4] "'Prospective donor' means an individual who is dead or near death and has been determined by a procurement organization to have a part that could be medically suitable for transplantation, therapy, research, or education. The term does not include an individual who has made a refusal." Ark. Code Ann. § 20-17-1202(22)

#125335480v1

scheduling and pre-recovery allocation, and the hospital's mandated forbearance of removal of measures, are actions taken in reasonable reliance that a gift will not be revoked. *See* Ex. A.

Finally, Defendants' attempt to reconcile the ambiguous portions of Act 861 only further highlight why the statute is void for vagueness. As the Supreme Court explained:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (footnotes omitted).

Even if the Defendants' view of the law were correct (which it is not), no one subject to Act 861 has a reasonable opportunity to determine what is prohibited based on the language of Act 861. This is only amplified by the fact that, months into the litigation, the Defendants stated for the first time that Act 861 must be interpreted in light of Arkansas common-law cases from the 1920s and 1930s and that they reserve the right to prosecute the Plaintiffs (and others) for violating the Act. The Court should declare Act 861 void for vagueness.

**C. If the Court Rules in the Defendants' Favor, the Court Should Acknowledge Defendants' Positions Upon Which it Relied for the Purpose of Judicial Estoppel.**

Southern Legacy of Life has argued since the outset of this case that, with Act 861 in place, its employees are under a real threat of prosecution simply by doing their jobs. Defendants have finally acknowledged this reality in their latest filing, when they held open the possibility that they could prosecute individuals for violating Act 861, reversing representations they had previously made to the Court. Accordingly, if this Court rules in favor of Defendants, this Court should acknowledge the positions Defendants have taken so that they may be estopped from reversing course in subsequent litigation.

Judicial estoppel has four elements:

13

#125335480v1

scheduling and pre-recovery allocation, and the hospital's mandated forbearance of removal of measures, are actions taken in reasonable reliance that a gift will not be revoked. *See* Ex. A.

Finally, Defendants' attempt to reconcile the ambiguous portions of Act 861 only further highlight why the statute is void for vagueness. As the Supreme Court explained:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (footnotes omitted).

Even if the Defendants' view of the law were correct (which it is not), no one subject to Act 861 has a reasonable opportunity to determine what is prohibited based on the language of Act 861. This is only amplified by the fact that, months into the litigation, the Defendants stated for the first time that Act 861 must be interpreted in light of Arkansas common-law cases from the 1920s and 1930s and that they reserve the right to prosecute the Plaintiffs (and others) for violating the Act. The Court should declare Act 861 void for vagueness.

**C. If the Court Rules in the Defendants' Favor, the Court Should Acknowledge Defendants' Positions Upon Which it Relied for the Purpose of Judicial Estoppel.**

Southern Legacy of Life has argued since the outset of this case that, with Act 861 in place, its employees are under a real threat of prosecution simply by doing their jobs. Defendants have finally acknowledged this reality in their latest filing, when they held open the possibility that they could prosecute individuals for violating Act 861, reversing representations they had previously made to the Court. Accordingly, if this Court rules in favor of Defendants, this Court should acknowledge the positions Defendants have taken so that they may be estopped from reversing course in subsequent litigation.

Judicial estoppel has four elements:

#125335480v1

> 1. A party must assume a position clearly inconsistent with a position taken in an earlier case, or with a position taken in the same case;
> 2. A party must assume the inconsistent position with the intent to manipulate the judicial process to gain an unfair advantage;
> 3. A party must have successfully maintained the position in an earlier proceeding such that the court relied upon the position taken; and
> 4. The integrity of the judicial process of at least one court must be impaired or injured by the inconsistent positions taken.

*Lewis v. Crelia*, 229 S.W.3d 19, 21 (Ark. 2006).

So that the element of reliance by the Court can be maintained in a subsequent action, the Court should note whether any decision in the Defendants' favor is based on any of the following admissions:

- Act 861 is not a criminal statute. (Pl. Tr, 154-155)
- Act 861 does not say that there is a private right of action of a citizen against an OPO. (*Id.* at 157)
- Under no circumstances do the prosecutors or the attorney general have any power to enforce Act 861. (*Id.* at 157)
- As long as an OPO provides a report in accordance with Act 861, the Secretary of States cannot revoke its non-profit charter in Arkansas. (*Id.* at 157-158)
- Next of kin cannot revoke an organ donation until two hours after a cross clamp is applied. (*Id.* at 159)
- Any organ removed within the two-hour window after a cross clamp is gifted irrevocably and cannot be taken back. (*Id.* at 159)
- OPOs and any person acting in good faith have civil and criminal immunity for violations of Act 861 even though the immunity provision says "notwithstanding any law to the contrary." (*Id.* at 161)
- Defendants are enjoined from enforcing Act 861 if the Court does so on the Defendants' representation that they will not enforce Act 861. (*Id.* at 161).

To the extent that any of these admissions were made in error, Defendants should correct those misstatements in their Reply Brief.[5] While the Plaintiffs do not mean to cast aspersions on

---

[5] Likewise, to the extent the Defendants have misstated facts, they should also correct those misstatements. For instance, Defendants state that "at around the two-hour mark …the organ procurement organization is usually finished removing most organs and begins removing tissue[,]" and then cite Mark Tudor's unambiguous testimony that kidney extraction likely would not have begun by the 2-hour mark. D. Sup. Br. at 6. Furthermore, Defendants make repeated unsupported and lurid insinuations and "fact" statements concerning crucial, life changing tissue and skin transplant, including that it is a "uninformed decision to donate skin that could prevent the open casket funeral that the deceased wanted." D. Sup. Br. at 3. Suffice it to say that Plaintiffs dispute these unsupportable claims.

Defendants, they would be remiss if they did not note that the Defendants have already appeared to reverse course on some of these positions, and, in the event the Plaintiff Southern Legacy of Life does not prevail, it believes that it faces serious criminal and civil liability for simply performing its job.

### III. CONCLUSION

For the foregoing reasons, and those contained in Plaintiffs' original motion, this Court should grant the Plaintiffs' Amended Motion for Preliminary Injunction/Temporary Restraining Order and Deny the Defendants' Motion to Dismiss.

Date: November 20, 2025

Respectfully submitted,

E. B. Chiles IV, Ark. Bar No. 96179
J. Houston M. Downes, Ark. Bar No. 2023149
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
(501) 379-1700 (telephone)
(501) 379-1701 (facsimile)
cchiles@qgtlaw.com
hdownes@qgtlaw.com

David Smith (*admitted pro hac vice*)
Christina Strong (*admitted pro hac vice*)
David Rodkey (*admitted pro hac vice*)
DILWORTH PAXSON LLP
1650 Market Street, Suite 1200
Philadelphia, PA, 19103
(215) 575-7062 (telephone)
(215) 754-4603 (facsimile)
dsmith@dilworthlaw.com
cstrong@dilworthlaw.com
drodkey@dilworthlaw.com

*Attorneys for Plaintiffs*